## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>BRETT CLINTON COMBS,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER DENYING MOTION TO SUPPRESS**<br><br>Case No 4:22-cr-00076- RJS-PK<br><br>Chief District Judge Robert J. Shelby<br>Magistrate Judge Paul Kohler |

Defendant Brett Clinton Combs is charged with 1) Theft of Firearms from a Licensed Dealer in violation of 18 U.S.C. § 924(m), and 2) Felon in Possession of Firearms in violation of 18 U.S.C. § 922(g)(l).[1]  The charges stem from a burglary at Dixie Gun & Fish in St. George, Utah on March 4, 2022.[2]  The burglar broke through the gun shop's front door, shattered glass cases, and took several firearms.[3]  Combs, then under federal supervision in the District of Nevada, was a suspect.[4]  In June 2022, an arrest warrant for him issued out of the District of Utah and search warrants issued out of the District of Nevada for his home and a white Volkswagen Passat[5] he was known to drive.[6]

On the morning of June 28, 2022, Combs was drawn via a ruse to the United States Probation office in downtown Las Vegas,[7] handcuffed, and told he was the subject of a federal arrest warrant and that there was a warrant to search his home.  Officers did not initially inform

---

[1] Dkt. 9, *Indictment*.

[2] Dkt. 93, Transcript of Evidentiary Hearing on March 13, 2024, at 8:1-4.

[3] *Id.* 8:15-18.

[4] *Id.* 8:19-23.

[5] *Id.* 10:10-11.

[6] *Id.* 9:13-23.

[7] *Id.* 11:8-18.

him they also had a warrant to search his car.  Officers questioned and conversed with Combs without first giving warnings required under *Miranda v. Arizona*,[8] including questions about whether he had driven the target car that day and where it was parked.  Combs said he drove the car and it was parked in a nearby neighborhood.  He then seemingly stated he wanted an attorney.  But the conversation continued—including a drawn-out explanation of *Miranda* rights.

Before the court is Combs' Motion to Suppress in which he seeks suppression of 1) any statements he made during the questioning after his arrest, arguing they were obtained in violation of *Miranda*; and 2) any evidence obtained resulting from the search of his car, where its location was discovered as a result of coerced, involuntary statements made early in the questioning, prior to any *Miranda* warnings.[9]  The United States opposes the Motion, arguing 1) it will not seek to use any of Combs' statements made during the interview in its case in chief at trial, thus mooting part of the Motion; 2) even assuming *Miranda* was breached, Combs' statements about the car were voluntary and therefore physical evidence found as a result of the statements need not be suppressed; and 3) the car would have been found even without information from Combs as an inevitable discovery or from an independent source.[10]

As discussed below, Combs' initial statements about the car during the officers' custodial interrogation were voluntarily given, and therefore his Motion to Suppress physical evidence obtained from the car is DENIED.  The remainder of Combs' Motion, seeking suppression of statements he made, is also DENIED as it is moot in view of the United States' concession that it will not use any of the statements made in the questioning in its case in chief at trial.

---

[8] 384 U.S. 436 (1966).

[9] Dkt. 70, *Defendant's Motion to Suppress*; Dkt. 96, *Defendant's Brief on Motion to Suppress.*

[10] Dkt. 97, *United States' Response to Defendant's Motion to Suppress.*

# BACKGROUND

In the summer of 2022, Combs was on federal supervised release in Nevada.[11]  His probation agent was Cecil McCarroll.[12]  Following the above-described burglary at Dixie Gun & Fish, Combs was lured via a ruse to meet with McCarroll in the United States Probation office in downtown Las Vegas on June 28, 2022.[13]  At 8:08 that morning, Combs was brought into a conference room there with a large table, leather office chairs, and a wall-mounted television. McCaroll walked into the room, along with Special Agent Jonathan Lee (SA Lee) with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF).  St. George, Utah Police Detective Chad Lee was also in the room.

The ensuing interactions were captured on a body camera Det. Lee had placed in the conference room,[14] and the resulting continuous footage was introduced as an exhibit at the evidentiary hearing on March 13.[15]  Much of the factual background set forth herein is derived from the time-stamped video footage.[16]

SA Lee introduced himself to Combs and shook his hand.  SA Lee was dressed casually, in a black t-shirt and jeans.  Similarly, McCarroll wore jeans and a polo shirt, while Det. Lee

---

[11] Dkt. 93 at 9:5-6.

[12] *Id.* at 10:4.

[13] *Id.* at 11:7-15.

[14] *Id.* at 12:22-25.

[15] *Id.* at 13:19-23, 20:21-24.

[16] The video footage's timestamp is shown in Mountain Time (the zone in St. George, Utah), while the questioning actually occurred in Las Vegas, which is on Pacific Time.  *See* Dkt. 93 at 13:12-18.  The court's references to time are to the Pacific Time, an hour earlier than shown on the video's timestamp.

wore jeans and a short-sleeved button-down shirt.[17]  All the officers were armed, but their

firearms were concealed under their shirts.[18]

     With McCarroll standing nearby, SA Lee patted Combs down, removed car keys and a

wallet from the pockets of his denim shorts,[19] handcuffed Combs in front of his body, and stated

he would "explain everything in a moment."  SA Lee invited Combs to sit down in a leather

chair, and he did.  SA Lee observed in Combs no signs of illness, mental difficulties, or

communication problems.[20]  Combs was about forty or forty-one years old at the time.[21]

     SA Lee asked Combs "[h]ow'd you get here today?"  Combs confirmed he drove.  SA

Lee then asked Combs if he brought his "white Passat?"  Combs answered "yes."  SA Lee then

again stated "I'll explain everything in just a moment."  After typing into his smartphone for a

few moments, SA Lee showed his ATF identification to Combs, and informed him there was a

federal arrest warrant for him.  He then suggested Combs "probably has lots of questions," and

those are things they "can all work out here," but SA Lee stated he first needed to quickly get

some basic information, and then he and Combs could talk about why Combs was handcuffed

and why there was an arrest warrant.

     SA Lee then informed Combs there was also a search warrant for his house, and that he

needed to know who was in the house.  SA Lee later testified at that time there were officers at

Combs' home to conduct the search, and others "in the area of the probation office looking for

---

[17] Dkt. 93 at 12:6-9.

[18] *Id.* at 12:10-18.  On the video footage before Combs enters the conference room, McCarroll's firearm is visible where his shirt is raised in the back. When Combs is in the conference room, McCarroll's shirt appears to be covering the firearm.

[19] Later video footage showed Combs was wearing knee-length shorts, socks, and athletic shoes.

[20] Dkt. 93 at 14:16-19.

[21] *Id.* at 9:7-9.

Mr. Combs' vehicle."[22]   In response to the questions, Combs offered that his girlfriend was in the house, working from home, along with a friendly schnauzer puppy they had, and that his girlfriend would be cooperative.   In response to further questions, Combs confirmed there were no guns in the house and it was not 'booby-trapped.'

At 8:12 a.m., SA Lee asked for Combs' girlfriend's phone number, but Combs didn't have it memorized.   SA Lee asked him if his phone was in his car.   Combs answered yes.   SA Lee then asked Combs where he had parked his car.   Combs nodded his head to his right and informed SA Lee his car was "in the neighborhood over there."   SA Lee then left the room to "make a quick call."   This exchange occurred only four minutes after Combs entered the conference room.

SA Lee left and then spoke to the officer who would supervise the search at Combs' home to give them information to further assess how to execute the warrant.   He also gave the information from Combs to officers who "were in the area looking for the vehicle."[23]

While SA Lee was doing this, someone off-camera but in the conference room—Det. Lee or McCarroll—asked Combs about his work as a stagehand for several casinos.   Combs offered short answers.   Someone then asked Combs if he was from Las Vegas.   Combs answered "no" and offered no further information.   He then sat quietly, and the person off-camera (seemingly Det. Lee)[24] stated that SA Lee will "explain everything."

SA Lee returned to the room at 8:15.   He asked Combs to confirm his name, birthdate, address, how long he has lived there, his prior address, and his phone number.   He asked Combs

---

[22] *Id.* at 15:15-17.

[23] *Id.*at 16:20-25, 17:1.

[24] At oral argument, counsel for the United States proffered Det. Lee was the one speaking to Combs after SA Lee left the room.

if he was from Las Vegas, and Combs again responded only with a terse "no" until further

prompted, at which point he stated he was from Reno.  SA Lee then asked several questions

about Combs' work and employer.

> The officers then briefly introduced themselves, after which Lee and Combs conversed:
>
> **SA Lee:** I, I, I'm actually from Utah.  That's where I work, okay? [SGPD Det. Chad Lee then introduced himself].  You can call me Jonathan.  I'm really laid back.  And, like I said, I just want to be able to just have a conversation . . . that's all it is, okay?  So, like I said, we do have an arrest warrant for your arrest.  We have a search warrant for your residence and for your vehicle as well.  Okay?  Um…but before we can um…talk about that I want to go through your rights.  Okay?  Have you ever had your rights read to you before?
>
> **Combs:** Yeah.
>
> **SA Lee:** Yeah?  Um, how many times do you think you've had them read to you before?
>
> **Combs:** I'm not sure.
>
> **SA Lee:** You're not sure?  More than once?
>
> **Combs:** Yep.
>
> **Lee:** Okay.  If there is anything you don't understand when we're talking today… um…
>
> **Combs:** …I understand I think I need a, an attorney for this conversation.
>
> **Lee:** What's that?
>
> **Combs:** I understand I believe I need an attorney for this conversation.

SA Lee later testified he thought Combs' statements about needing an attorney were "very

unclear," because he "used words like 'I think' and 'I believe' . . . ."[25]  He continued conversing

with and questioning Combs:

> **SA Lee:** Yeah, that's one of your rights and I can go through them. I just want to make sure you understand everything and then we can talk about that, okay?
>
> **Combs:** [unintelligible during Lee's comment above]
>
> **SA Lee:** Um…so…uh… if there's anything you don't understand let me know because I want to make sure you understand everything, okay?  And, we'll get to questions and whatnot um, but the first right is you have the right to remain silent.  Do you understand that?

---

[25] Dkt. 93 at 18:8-12.

**Combs:** Yeah.

**SA Lee:** Ok, do you have any questions about that?

**Combs:** No.

**SA Lee:** Alright. Anything you say can be used against in a court. Do you understand that?

**Combs:** Yes.

**SA Lee:** Ok. No questions about that?

**Combs:** No.

**SA Lee:** Alright.  You have the right to talk to a lawyer before we speak.  Uh, before I ask any questions and to have a lawyer with you during questioning.  You kind of alluded to that already that you understand that right.

**Combs:** Uh huh.

**SA Lee:** And then if you cannot afford a lawyer one will be appointed for you if you wish before any questioning [unintelligible because of noise].  Make sense?

**Combs:** Uh huh.

**SA Lee:** Okay.  Do you have any questions about that right now?  Just questions about it?

**Combs:** No.

**SA Lee:** Okay.  Alright.  And if you decide to talk with us and answer any questions without a lawyer present you can stop at any time.  So, you get to choose what questions you want to ask, er, answer… uh, you can tell me when to stop whenever, um, so I want you to understand that that's how that would work, okay? Does that make sense?

**Combs:** Yeah

**SA Lee:** Okay. So, having these rights in mind, would you be willing to talk with us and answer some questions and we can answer any of your questions?

**Combs:** I don't have any… answers for you.

**SA Lee:** You don't have any answers for me?

**Combs:** No.

**SA Lee:** Okay. Would you be willing to at least listen to my questions?

**Combs:** Go ahead.

**SA Lee:** Okay. So you're good talking with us?

**Combs:** I'll listen to your questions.

**SA Lee:** Okay. Alright. Just making sure you just don't have any questions about those rights. Um…how often do you say, you travel for work?

**Combs:** Here in Las Vegas?

**SA Lee:** Like, do you ever have to leave the state?

**Combs:** No.

**SA Lee:** You never have to leave the state?

**Combs:** No.

**SA Lee:** Okay.  Do you have family that live out of state?

**Combs:** No.

**SA Lee:** No.  Alright.

**Combs:** Well, in Kansas.

**SA Lee:** Oh, Kansas, okay.  Do you ever go visit them?

**Combs:** No.

**SA Lee:** No.  When do you think the last time was that you left Nevada?

**Combs:** I don't know.

**SA Lee:** You don't know? Would you say in the past month?

**Combs:** I'd say we have to talk to my attorney.

**SA Lee:** Okay.  Alright.  That's fine.  Um…just for that question or do you care if I ask other questions.

**Combs:** I don't really like having this camera on me right here.

**SA Lee:** It's uncomfortable, isn't it?  Okay.  Alright.  Um…you don't have any questions for me?

**Combs:** I figured you're here because you want to tell me something.

**SA Lee:** Well, I told you, we have an arrest warrant and a search warrant...

**Combs:** Okay.

**SA Lee:** …for your residence and your car.

**Combs:** Alright.

**SA Lee:** Do you have any questions about those?

**Combs:** No.

**SA Lee:** No.  Okay.  Do you want to answer any other questions?

**Combs:** No.

**SA Lee:** Okay.  Alright.  Alright well…I appreciate that, Brett.  Um, here in a little bit, you'll eventually go to…I imagine… the jail in Henderson and then you'll have a court hearing tomorrow.

**Combs:** Okay.

**SA Lee:** Okay.

This portion of questioning ended at 8:21 a.m.  SA Lee left the room, and Combs remained seated in his chair.  At 8:23, Det. Lee or McCarroll, off-camera, commented that cameras were all over the federal building.  He then asked Combs if he was a Raiders fan, to which Combs quietly answered "no."  Det. Lee or McCarroll kept chatting for some time about the Raiders, their fans, and Las Vegas's hockey team.

At 8:25, SA Lee returned and informed Combs they were waiting for a transport to the jail.  He asked Combs if he had permission to give his car keys and belongings to his girlfriend, and Combs agreed.  SA Lee then offered to try to find his girlfriend's phone number.  Combs asked SA Lee what the officers were looking for, and SA Lee reviewed the warrants with Combs and explained some of the items sought, including firearms, electronics, and clothing.

At 8:31, SA Lee stated "the other point of why I'm here, just so you know was, if you wanted to make a statement, I'd pass along any cooperation you want to the United States Attorney who makes decisions . . . so.  But, you have requested your attorney, that is your right, um I wanted to just tell you that . . . that's part of my other job . . . that's part of my job, ok?"  Combs nods and quietly says "yeah."  SA Lee asked if Combs had any questions "about the documents," and Combs said no.

At 8:34, SA Lee left the room again.  He returned at 8:55, informed Combs he would be taking a few photographs, and asked Combs to stand up and against the wall.  Combs did so.  SA Lee took photographs of Combs' front, back, profiles, shoes, arms (including slightly lifting up Combs' t-shirt sleeves slightly), hands, raised arms, and his legs.  SA Lee removed a baseball cap Combs was wearing, and someone off camera—possibly Det. Lee—asked Combs if there was anything in his wallet they "should know about."  Combs shook his head and said "no."

Up to that point, SA Lee had communicating intermittently with officers at Combs' home and "had also been made aware" that Combs Passat had been found[26] at the intersection of 7th and Bonneville Streets.[27]   Another officer watched over the car until it was later searched.[28]

SA Lee then told Combs he would be placing belly chains and shackles on him, and Combs stood to permit this.  SA Lee removed Combs' handcuffs, photographed his palms, and began to get the chains and shackles on Combs.  Det. Lee asked Combs if there were any drugs or medical issues they should know about, or alcohol use.  Combs shook his head no.

At 9:00, Combs asked if his bagged possessions (wallet, car keys, and money) would be given to his girlfriend.  SA Lee responded that they would be and promised to "let her know where your vehicle is and all that stuff and give her the keys."  Combs then offered, "[m]y vehicle's on 7th."  SA Lee responded, "7th and Bonneville, right?"  Combs nodded affirmatively and seemed to say "yeah."[29]  SA Lee nodded and said "ok."  SA Lee later testified that he had previously been told the car had been found, and that he "knew the cross street [Bonneville] which Mr. Combs did not provide to me."[30]

SA Lee invited Combs to sit in a chair while he packed things up.  At 9:03, with SA Lee nearly done packing up, someone off-camera asked Combs if he had any final questions for the officers.  He did not.  Combs was walked outside and into the front passenger seat of a car.

---

[26] Dkt. 93 at 20:1-6 (noting communications that had occurred between video clips, with the second clip beginning with Combs being shackled).

[27] *Id.* at 22:14-17.

[28] *Id.* at 22:17-19.

[29] On initial review of the video, it seemed to the undersigned as if Combs said "no" in response to SA Lee's confirming that the car had been parked at "7th and Bonneville."  But upon a closer (and repeated) review, and because Combs shook his head affirmatively and it appeared by SA Lee's actions and all the circumstances that the car had already been found, it appears Combs said "yeah" or "yep"— a response that also makes sense in view of the totality of the facts. Regardless, SA Lee testified the car had been found before this point, and this exchange is immaterial to the resolution of Combs' Motion.

[30] Dkt. 93 at 20:4-10.

SA Lee then went to the intersection of 7th and Bonneville, where Combs' car had been found.[31]  With the key taken from Combs at the outset of his arrest, SA Lee opened the car and a search was conducted.[32]

Combs was charged in a felony Indictment[33] with 1) Theft of Firearms from a Licensed Dealer—Dixie Gun & Fish (18 U.S.C. § 924(m))—and 2) Felon in Possession of Firearms (18 U.S.C. § 922(g)(1)).  His counsel filed a Motion to Suppress in November 2023, citing three grounds.[34]  At an evidentiary hearing on January 10, 2024, Combs' counsel withdrew two of those grounds, and the evidentiary hearing was continued.[35]  After the parties met and conferred, the United States submitted a status report[36] stating there was just one issue to resolve: alleged "violations of [Combs'] constitutional rights during a June 28, 2022 interview."[37]

The court held the continued evidentiary hearing on March 13, 2024.  On April 9, 2024, Combs filed a brief in support of his Motion to Suppress,[38] and the United States filed a responsive brief on May 2, 2024.[39]  Final argument was held on May 13, 2024.

## DISCUSSION

As noted above, Combs argues in his Motion to Suppress[40] that 1) the statements he made on the morning of June 28, 2022 may not be used against him at trial due to the officers' failure

---

[31] *Id.* at 22:14-17.

[32] *Id.* at 22:20-22.

[33] Dkt. 9

[34] Dkt. 70.

[35] Dkt. 7.

[36] Dkt. 82.

[37] *Id.* at 2.

[38] Dkt. 96.

[39] Dkt. 97.

[40] Dkt. 96.

to comply with *Miranda*;[41] and 2) the "evidence discovered in the [Passat] should be suppressed," where Combs' statements about the car and where it was parked were coerced and involuntarily given.[42]

For purposes of resolving Combs' Motion, the United States has assumed without conceding that there was a *Miranda* violation, and that it "does not intend to use any of the statements [Combs made] during the interview of June 28, 2022 in its case in chief at trial subject to rebuttal and/or impeachment."[43]  But the United States argues the physical evidence gathered from the search of Combs' Passat need not be suppressed, where: 1) Combs' statements about the car's location were voluntary, and 2) even without the statements, the officers would have found the car either from an independent source or as an inevitable discovery.

As discussed below, Combs' initial statements about his car were voluntarily given. Assuming they helped law enforcement find the car—something not entirely clear from the record—evidence derived from the warranted search therefore need not be suppressed.  But the United States has not provided an adequate factual basis upon which to conclude officers would have found the car either due to an independent source or as an inevitable discovery.  Thus, neither theory provides an alternative basis upon which to deny Combs' Motion.

## I.   Applicable Legal Principles

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be  compelled in any criminal case to be a witness against himself."  In *Miranda v. Arizona*, the Supreme Court addressed the "inherently compelling pressures" of custodial interrogation.[44]

---

[41] *Id.* at 2.

[42] *Id.* at 2-3.

[43] Dkt. 97 at 17.

[44] 384 U.S. 436 (1966).

The Court announced that officers must warn a suspect subject to custodial interrogation that he or she has the rights to remain silent and to the presence of an attorney.[45]  Once warnings are given, a suspect may knowingly and voluntarily waive their rights and answer questions; or they may wish to remain silent or invoke their right to counsel—and then interrogation must stop.[46]

The Supreme Court explains that "if a suspect makes a statement during custodial interrogation, the burden is on the Government to show, as a 'prerequisit[e]' to the statement's admissibility as evidence in the Government's case in chief, that the defendant 'voluntarily, knowingly and intelligently' waived his rights."[47]  A "failure to administer *Miranda* warnings prior to a custodial interrogation 'creates a presumption of compulsion,' and the confession is inadmissible with no need for the 'time-consuming and difficult enquiry into voluntariness.'"[48]

And when one subjected to custodial interrogation invokes the right to counsel, a valid later waiver of that right "cannot be established by showing only that [the accused] responded to further police-initiated custodial interrogation even if he has been advised of his rights:"

> [The accused] is not subject to further police-initiated custodial interrogation even if he has been advised of his rights. . . . [The accused] is not subject to further interrogation by the authorities until counsel has been made available . . . unless the accused himself initiates further communication, exchanges, or conversations with the police.[49]

The calculus changes when the government does not seek to introduce inculpatory testimony, but only physical evidence derived from custodial statements.  Under *United States v.*

---

[45] *Id.* at 444.

[46] *Id.* at 473-75.

[47] *J.D.B. v. North Carolina,* 564 U.S. 261, 269–70 (2011) (quoting *Miranda,* 384 U.S. at 444, 475–476 and *Dickerson v. United States,* 530 U.S. 428 at 443–444 (2000)); *see also United States v. Pettigrew*, 468 F.3d 626 (10th Cir. 2006) (citing *United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006) (noting "it is the Government's burden to show, by a preponderance of the evidence, that a confession was voluntary." )).

[48] *Pettigrew*, 468 F.3d at 635 (quoting *Oregon v. Elstad*, 470 U.S. 298, 307 (1985) and *United States v. Patane*, 542 U.S. 630, 646 (Souter, J., dissenting) (2004)).

[49] 451 U.S. 477, 484-85 (1981).

*Patane*,[50] even if complete *Miranda* warnings are not given, evidence derived from voluntary statements made during custodial interrogation need not be suppressed.

The United States has, for purposes of responding to Combs' Motion, assumed *Miranda*'s safeguards were not properly implemented, and has stipulated they will not seek to introduce Combs' statements in its case-in-chief.[51]  This concession moots the first part of Combs' Motion, in which he seeks to suppress those statements.[52]  Left to decide is Combs' second argument, that physical evidence gathered upon finding Combs' car must be suppressed where law enforcement looking for the car to execute a search warrant[53] relied on Combs' un-*Mirandized* statements about the car's location.  Combs argues his statements about the car were involuntarily given, and thus under *Patane*, evidence derived from finding the car must be suppressed.[54]  The United States responds that the statements about the car were voluntarily given before it was found near the intersection of 7th and Bonneville,[55] and further that officers would have found the car regardless as an inevitable discovery or from an independent source.[56]

Below, the court concludes Combs' statements that he had driven and about the car's location in a nearby neighborhood were voluntary.  Thus, to the extent they helped officers find his car, the evidence derived from finding the car need not be suppressed.  The remaining grounds for admissibility cited by the United States—inevitable discovery and independent

---

[50] 542 U.S. 630 (2004).

[51] Dkt. 97 at 1, 17.

[52] Dkt. 96 at 2.

[53] Though the parties have not presented the warrant(s) as exhibits in briefing Combs' Motion, Combs does not argue the search warrant for his white Volkswagen Passat was infirm in any way.

[54] *Id.* at 3 (arguing law enforcement sought to recover "flashlights, clothes, and other items" apparently in the car).

[55] Dkt. 97 at 20-24.

[56] *Id.* at 24-27.

source—were inadequately briefed or supported by the record. They do not provide additional grounds upon which to deny the Motion.

## II.     Combs' Initial Statements about his Car Were Voluntary and, Assuming they Helped Officers, Evidence Derived from Finding the Car Need Not Be Suppressed

Shortly after Combs' arrest in the United States Probation office, officers obtained information that arguably helped them find his white Passat Volkswagen for which they had a search warrant. First, they immediately obtained car keys from Combs' pocket, suggesting he drove to the office. Second, without first offering *Miranda* warnings, SA Lee asked him questions related to his car, including whether he had driven that morning and where the car was parked. In response, Combs confirmed he had driven to the Probation office, and nodded in the direction of the neighborhood where his car was parked.

These are the only statements from Combs about his car or its location until after officers found the car, and Combs later confirmed it was "on 7th." Indeed, Combs' counsel agreed at oral argument this early exchange was the only one that might have helped the officers find Combs' car. Thus, these statements are the only ones the court evaluates.[57]

Moreover, the court assumes for purposes of this Order that Combs' statements helped officers find the car, though the record does not clearly establish this. The officers could infer from retrieving car keys from Combs' pocket that he may have driven to the Probation office. And from SA Lee's testimony, it can be inferred the car was in fact found near the Probation office before Combs was shackled and spontaneously stated that the car was "on 7th." But no

---

[57] At the final argument on May 13, Combs' counsel agreed the early exchange in the interrogation beginning with "did you drive here today" was the only one with a possible nexus to the car's discovery. This seems correct in view of SA Lee's testimony that the car was found before any later statements seemingly simply confirming its known location at the intersection of 7th and Bonneville, and the video footage showing SA Lee doing nothing further with that confirmed location. Instead, he appears on video to begin packing up his things.

testimony or argument in the briefing clearly indicates the car was actually found in the neighborhood where Combs had nodded, such that his statement on the car's location helped. But the United States has also not shown the statements were unhelpful in finding the car. At best, the United States submits in its briefing that it does "not necessarily concede that any statements from [Combs] actually led to (or even materially assisted in) the discovery of the physical evidence sought to be suppressed."[58]  Therefore, the court assumes Combs' statement narrowed the officers' search.[59]

And, for purposes of resolving Combs' Motion, the United States concedes and therefore the court assumes these statements were obtained in violation of *Miranda*.  The United States argues that while it will not use these statements in its case in chief at trial, the physical evidence from finding the car need not be suppressed, because the statements were voluntary.

Under *Patane* and Tenth Circuit cases following it, "the failure to provide a suspect with *Miranda* warnings does not require suppression of the physical fruit of a 'suspect's unwarned but voluntary statements.'"[60]  As discussed below, Combs' statements that he drove to the Probation office and that the car was parked in a neighborhood in a certain direction were voluntary.  Thus, assuming they helped officers find the car which was then searched pursuant to a warrant, the fruits of that search need not be suppressed.

"Although 'a *Miranda* violation raises a presumption of coercion,' the test is 'whether a [suspect's] will was overborne by the circumstances surrounding the giving of a confession.'"[61]

---

[58] Dkt. 97 at 2 n.2.

[59] Combs' counsel suggested at oral argument that the information about the neighborhood helped the officers narrow their search.  This may be true, but it has not been established, where there is no evidence in the record that the car was found in the direction Combs nodded.

[60] *United States v. Ray*, 799 Fed.Appx. 599, 602 (10th Cir. 2020) (quoting *Patane*, 542 U.S. at 634).

[61] *Id.* (quoting *Patane*, 542 U.S. at 646 and *Dickerson*, 530 U.S. at 434).

This test is "based on the totality of the circumstances," considering the suspect's characteristics and the nature of the interrogation.[62]  Factors to consider "can include: '(1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subjected to physical punishment.'"[63]

The Tenth Circuit in *United States v. Ray* recently affirmed the district court's denial of a motion to suppress, agreeing that the defendant's statements were voluntarily given after he had been crying and expressing suicidal thoughts, and was handcuffed in the back of a patrol car following a traffic stop.[64]  Though unpublished, the decision helpfully illustrates the test for voluntariness.

There, the defendant, Terry Ray, had been stopped for a traffic violation while driving. He was searched by the patrol officer, who found methamphetamine.  The officer asked Ray whether he had other contraband in his car, and Ray said he did.  Ray then "realized he was going to jail," "cried and made suicidal comments,"[65] and was handcuffed and placed in the back of the patrol car.[66]  The patrol officer and another officer who arrived on the scene did an inventory search of the car but—without providing *Miranda* warnings—also repeatedly returned to the patrol car to ask Ray about any other contraband.  Ray "hesitantly admitted that he had a

---

[62] *Id.* (citations omitted).

[63] *Id.* at 602-03 (quoting *United States v. Toles*, 297 F.3d 959, 966 (10th Cir. 2002)).

[64] *Id*. at

[65] *Id.* at 601.

[66] *Id.*

blasting cap (an explosive) in the vehicle," and that cap was recovered.[67]  Ray also stated he had

more caps at another unnamed location.[68]

After Ray was charged with being a felon in possession of explosives, he moved to

suppress his statements and the evidence found during and after his traffic stop.  Relevant here,

the district court found while his unwarned statements made while handcuffed in the back of the

patrol car should be suppressed due to a *Miranda* violation, the blasting cap need not be

suppressed because Ray voluntarily made the statements about it.[69]

The Tenth Circuit affirmed, finding under the above-cited factors that Ray's statements

were voluntary.  Though Ray made the statements while handcuffed inside a patrol car, he had

not been physically mistreated or threatened with violence, the officers "acted in a restrained

manner," and they "did not draw their weapons at any time."[70]  And though Ray had been crying

and expressing suicidal thoughts, the court of appeals found the officers did not "coerce [his]

statements through non-physical means."[71]  The officers were amiable in their conversation and

Ray "appeared composed"[72] when he was answering their questions, and the officers therefore

had not "'exploited a weakness of condition known to exist.'"[73]  Finally, the "limited and

conversational nature of the interaction" between the officers and Ray weighed in favor of

finding Ray's statements were voluntary.[74]

---

[67] *Id.*

[68] *Id.*  Ray later made other statements while in custody in jail and after having been given *Miranda* warnings.

[69] *Id.* at 603.

[70] *Id.* (citing *United States v. Silva-Arzeta*, 602 F.3d 1208, 1215 (10th Cir. 2010)).

[71] *Id.*

[72] *Id.*  The court of appeals noted the questioning was captured on the officers' body cameras.  *Id.* n.2.

[73] *Id.* (quoting *United States v. Guerro*, 983 F.2d 1001, 1004 (10th Cir. 1993)).

[74] *Id.* at 604.

Combs' statements about the car were similarly voluntary here.  First considered are Combs' characteristics when he was arrested and questioned.  He was about forty years old and worked as a stagehand.  While there is no evidence concerning his education, Combs spoke English, appeared sober and alert on the video footage, and seemed to clearly understand everything said to him.  Moreover, he had prior interactions and general familiarity with law enforcement, as he was on federal supervised release and indicated he had been arrested in the past—perhaps multiple times.  While Combs' demeanor appears serious and possibly concerned over the course of the questioning, he also appears composed and initially conversational.  These facts weigh in favor of voluntariness.

Second, the nature of the detention, including its relatively brief length, also weighs in favor of finding Combs' statements about the car were voluntary.  Combs' arrest and detention took place in the United States Probation office in Las Vegas, a place he was familiar with as part of his supervised release.  Combs' own Probation officer was also there—someone he knew and had worked with to that point.  Also present were SA Lee and Det. Lee.  All were dressed casually, and with weapons neither visible nor drawn.  Combs was not isolated or kept from the view of others.  Not only did the arrest and questioning occur in the morning on a regular workday, Tuesday, June 28, 2022, in a conference room, but it was also recorded on Det. Lee's body camera.  While Combs mentioned the camera made him uncomfortable, the undersigned finds its presence weighs in favor of voluntariness where any misconduct or threats would have been captured in its footage—and there were none.  To the contrary, SA Lee spoke to Combs in a professional and conversational way, never raised his voice, and did not repeat questions or seem to be badgering Combs.  SA Lee asked the questions about whether Combs drove and where the car was just once, and Combs answered those questions four minutes after his arrest.  Thus, the

facts concerning the nature of the questioning weigh in favor of finding Combs' early statements about the car were voluntary.

Finally, Combs was not subjected to physical mistreatment or any threats.  It is true he was handcuffed, though with his arms placed in front of rather of him than behind for his comfort.  The Tenth Circuit has recognized "arresting and handcuffing are coercive acts."[75]  But these acts do not foreclose a finding that an arrestee's subsequent statement is nevertheless voluntary.[76]  Combs' entire interaction with the officers was captured on Det. Lee's camera, including the first few minutes in which the only relevant statements were made.[77]  As noted above, SA Lee spoke in a professional manner.  No threats were made, and no inappropriate or threatening physical contact occurred.  Before the statements in question were made, SA Lee had only shaken Combs' hand, patted him down for safety, emptied his pockets, and handcuffed him. He also then politely invited Combs to sit in a large leather office chair across a conference room table.[78]  While the officers may have been armed (and Combs may have assumed this fact), their firearms were not visibly displayed, let alone drawn, as a source of intimidation.

---

[75] *Silva-Arzeta*, 602 F.3d at 1215.

[76] *Id.* (noting "the consent of a handcuffed arrestee may well be voluntary.") (citing *United States v. Dozal*, 173 F.3d 787, 796 (10th Cir. 1999)).

[77] Combs' counsel suggests in his briefing that the video footage of Combs' questioning was interrupted at times, and officers may have physically harmed Combs during the alleged breaks in the recording.  Combs' counsel writes that "Combs knew that the body camera was being turned on and off" (Dkt. 96 at 3), and that while SA Lee testified that the video footage was continuous, "testimony also revealed that photographs of [Combs'] body were being taken during this arrest," but "[t]here was no time in the video, in which photographs were being taken."  *Id.* at 1. Counsel also at least insinuates that SA Lee may have physically harmed Combs while the camera was turned off, stating "regardless of whether Mr. Lee roughed up Mr. Combs off camera . . . ."  *Id.* at 3.  This theory is without factual support.  SA Lee testified that the video footage was continuous, and it appears to be continuous based on the undersigned's viewing.  Additionally, video footage depicts SA Lee taking photographs of Combs at two separate times, at 8:55 a.m. and then again of only Combs' palms a moment later.

[78] And after the statements were made, the only further physical contact occurred when SA Lee 1) took photographs of Combs and slightly lifted Combs' shirt sleeves, and 2) placed belly chains and shackles on Combs.

Based upon the totality of the above-described circumstances, Combs' statements about his car offered early in his interactions with officers on June 28, 2022—given about four minutes into his arrest and before he arguably asserted a right to counsel—were voluntarily given. Thus, to the extent the statements helped law enforcement find the white Passat Volkswagen for which they had a search warrant, the physical evidence derived from the search need not be suppressed.

### III.    The United States has Not Established that the Car Would Have Been Found Absent Combs' Statements Through Either an Independent Source or as an Inevitable Discovery

As alternative grounds to defeat Combs' Motion, the United States argues that officers would have found the Passat Volkswagen "[e]ven without the statements [Combs] provided . . . ."[79]  The United States argues law enforcement would have found the car due to an 'independent source' or as an 'inevitable discovery.'  They argue officers "that were not with [Combs] did locate, or would have located, [the car] independent of [Combs'] statements . . . ."  Even assuming both doctrines might apply in this case, these alternative theories fail because the United States does not provide a sufficient factual record upon which to conclude the car would have been found absent Combs' statements.

According to the Supreme Court, "the independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source," while "the inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source."[80]

The government does not support with record evidence that Combs' statements did not lead to law enforcement finding the car, either based on information from an independent source

---

[79] Dkt. 97 at 24.

[80] *Utah v. Strieff,* 579 U.S. 232, 238 (2016) (citing *Murray v. United States,* 487 U.S. 533, 537 (1988) and *Nix v. Williams,* 467 U.S. 431, 443–444 (1984)).

or as an inevitable discovery.  As noted above, at best the government has not conceded that the statements were helpful.  But they have failed to establish that the statements were immaterial to the search because the car would have been found by law enforcement in any event—i.e., by showing the car was found before Combs' statements were made, or in a neighborhood other than the one Combs indicated, or by an officer who was unaware of Combs' statements, or because it was parked in a tow zone that would have been patrolled or for any number of other reasons.  Thus, the court simply cannot evaluate whether officers would have found the car based on information from an independent source, or as an inevitable discovery—a notion that seems logically appealing but lacking in evidence.

## CONCLUSION

Based upon the foregoing, Combs' Motion to Suppress is

DENIED.[81]   DATED this 27th day of May 2024.

BY THE COURT:

The Honorable Robert J. Shelby
Chief United States District Court Judge

---

[81] Dkt. 70.